Argued and submitted May 14, affirmed October 22, 2003

# Angela Nicole BRYANT,
## *Respondent,*

*v.*

# Charles Edward WALKER, Jr.,
## *Appellant.*

## 02-01548CV; A118386

78 P3d 148

Karen M. Oakes argued the cause and filed the brief for appellant.

No appearance for Angela Nicole Bryant.

Before Edmonds, Presiding Judge, and Deits, Chief Judge,* and Schuman, Judge.

SCHUMAN, J.

Edmonds, P. J., dissenting.

---

* Deits, C. J., *vice* Kistler, J., resigned.

**SCHUMAN, J.**

Petitioner obtained a stalking protective order against respondent based on his repeated contacts with her at her workplace. On appeal, respondent raises a plethora of issues, only one of which was adequately raised below: whether sufficient evidence supported issuance of the order. We do not address the unraised issues. *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 380-82, 823 P2d 956 (1991). We affirm.

The facts, viewed (along with all reasonable inferences that can be drawn from them) in the light most favorable to petitioner, *Delgado v. Souders*, 334 Or 122, 134, 46 P3d 729 (2002), are as follows. In 1997, petitioner began work as a cashier at a large department store in Klamath Falls. She worked there for two years before moving. During that time, she noticed that respondent would enter the store, buy small items such as magazines and cigarettes, and pay for them at her check stand. She also noticed that he would stare at her from various parts of the store, but his behavior did not disturb her during that period.

After a year away from Klamath Falls, petitioner returned to work at the store in September 2000. For the next two years, she noticed respondent visiting the store at least three times a week. On one occasion, he parked his car next to hers as she pulled into the store's lot. Petitioner also once observed respondent drive by her house, but, according to her testimony, she lived on a busy street and was not certain that he saw her. Most of the disturbing contacts, therefore, occurred in the store, where respondent would follow petitioner from aisle to aisle and department to department, staring at her in a fashion that she and a coworker regarded as abnormal, ominous, and sexually suggestive. That conduct made petitioner uncomfortable and frightened, and at some point she asked the store's security personnel to monitor respondent when he was in the store. She also once asked respondent, "What are you looking at?" He responded, "Oh you look nice," to which she replied, "You don't need to stare." Thereafter they did not speak, but he continued to stare and

to follow her around the store. On at least one occasion, petitioner asked a coworker to stand by her for reassurance and protection when respondent was nearby. The coworker regarded defendant's conduct toward petitioner as so offensive that, as she testified, she glared at him as if to say, "Have some decency." Further, at some point, petitioner learned from a different coworker that, in 1992, respondent's ex-wife had petitioned for a restraining order against him on the ground that he was abusive and violent.

On April 27, 2002, petitioner contacted Klamath Falls police and described the situation and her concerns. An officer issued respondent an Oregon Uniform Stalking Citation. ORS 163.735. Pursuant to the citation, a show cause hearing was held on April 30 and May 9, 2002. Neither party was represented by counsel. The trial court issued a protective order. Respondent appeals.

■ Under ORS 163.738(2)(a)(B), petitioner may obtain a stalking protective order (SPO) against a person if the trial court finds by a preponderance of the evidence that:

"(i) The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(ii) It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(iii) The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

At a minimum, then, to obtain an SPO, petitioner must prove by a preponderance of the evidence that respondent had two or more contacts with her; that at least two of these contacts alarmed her; that her alarm was objectively reasonable; that respondent was aware of a substantial and unjustifiable risk that petitioner did not want those contacts and consciously disregarded that risk; and that the contacts, cumulatively, caused her reasonably to fear for her personal safety. *Delgado*, 334 Or at 134. Respondent argues that the evidence

does not permit a reasonable trier of fact to find by a preponderance of the evidence that these requirements have been met. We disagree.

 Abundant evidence supports the finding that repeated contacts occurred; a contact is defined to include "[c]oming into the visual or physical presence of the other person" and "[f]ollowing the other person." ORS 163.730(3)(a), (b). Further, corroborated testimony establishes that the contacts alarmed petitioner and caused her to fear for her personal safety. And although petitioner's one spoken exchange with respondent, when she told him to stop staring at her, does not conclusively establish that he *knew* that further contact would be unwanted, the exchange was surely sufficient to make him aware of a substantial risk that further contact was unwanted.

 The closer question is whether petitioner's fear and alarm were "objectively reasonable for a person in [her] situation * * *." ORS 30.866(1)(b). The significant contacts all occurred in a public place where petitioner was not alone. No overt threats occurred. However, respondent did drive by petitioner's house on one occasion, and, although she could not testify with certainty that he did so intentionally or even that he saw her, that one incident could reasonably have led petitioner to suspect that respondent knew personally identifiable information about her. In addition, she had information that, at some point in the past, respondent's then-wife had accused him of violence. Those facts, in light of the fact that petitioner is a 22-year-old woman,[1] suffice to support the conclusion that her alarm and fear were reasonable. We therefore reject respondent's substantive argument.

 As the dissent notes, respondent also argues on appeal that he did not have a constitutionally adequate hearing because the trial court did not allow him to be heard or to cross-examine petitioner. However, respondent did not object

---

[1] "[B]ased on the realities of men's and women's lives, reasonable women are likely to experience fear in situations where reasonable men would not. * * * [I]n our culture, men and women are not similarly situated when it comes to being able to defend and protect themselves from others." Caroline A. Forell and Donna M. Matthews, *A Law of Her Own: The Reasonable Woman as a Measure of Man* 133 (2000).

in any way to the trial court's conduct of the hearing. There-fore, he did not preserve the alleged procedural error. The dissent argues that we should nonetheless consider respon-dent's argument because the error is "apparent on the face of the record." ORAP 5.45(1). To be apparent on the face of the record, the error

"must be 'apparent,' *i.e.*, the point must be obvious, not reasonably in dispute; and * * * it must appear 'on the face of the record,' *i.e.*, the reviewing court must not need to go outside the record to identify the error or choose between competing inferences, and the facts constituting the error must be irrefutable."

*Ailes*, 312 Or at 381-82 (citing *State v. Brown*, 310 Or 347, 355-56, 800 P2d 259 (1990)).

In the present case, the alleged error is not undis-putable or irrefutable. At the hearing that led to the issuance of the permanent SPO, after petitioner had presented her evidence, the trial court asked respondent, "Okay, what's your response to this, Mr. Walker?" Respondent replied that he was upset that petitioner had informed his employer of the proceedings. In response to a question from the court, he reported that he had obeyed the directive to avoid contact with petitioner. At that point, the court recognized petitioner, who stated that she had "some further evidence." She then presented the court with a copy of the request for a restrain-ing order that respondent's ex-wife had filed in 1992, and also repeated all of the evidence she had already presented, this time in more detail.

When she finished, the following dialogue occurred:

"THE COURT: Anything further?

"MS. BRYANT: No.

"THE COURT: Okay, all right, well I think I have essentially heard enough. I am going to find that Mr. Walker has either intentionally, knowingly, or reck-lessly made repeated unwanted contact with you and an objectively reasonable person in your position would be alarmed by that contact and the contact has caused you reasonable apprehension regarding your personal safety. Therefore I am going to enter a court protective order."

Respondent's argument on appeal is that the trial court announced its decision without permitting him to present his case. One interpretation of the transcript supports that argument: If the court's question, "Anything further?" was directed solely to petitioner, then there could be merit in respondent's contention. Before a permanent SPO can be entered against a respondent, he must have "an opportunity to cross-examine adverse witnesses, including [the petitioner], and to present his own evidence." *Miller v. Leighty*, 158 Or App 218, 222, 973 P2d 920 (1999). However, we are unwilling to conclude on the record before us that the court's question was not directed also at respondent. If that was the case, then he was not deprived of his opportunity to present his case and cross-examine petitioner. He had the opportunity and did not take it. That is at least a permissible inference from the record; therefore, we conclude that the alleged error is not apparent on the face of the record. That being the case, we have no discretion to address it on appeal. *Ailes*, 312 Or at 381-82.

Affirmed.

**EDMONDS, P. J.,** dissenting.

Among the assignments of error that respondent makes on appeal is the claim that he was denied the opportunity to be heard by the trial court and to cross-examine petitioner in the trial of this matter in violation of the Fourteenth Amendment to the United States Constitution. The majority disposes of that argument on the ground that it was not preserved below. Alternatively, respondent contends that we should review the deprivation of his constitutional right to be heard and cross-examine as error apparent on the record. The majority apparently declines to conduct such a review. I disagree with the majority's decisions in those regards, and, for the reasons that follow, I would reverse the permanent stalking protective order in this case because respondent was not given the opportunity to respond to petitioner's newly submitted evidence.

Before I discuss the reasons that lead me to believe that respondent was not given the opportunity in the trial court to have his day in court that the law requires, I wish to add my observations about the majority's holding that it was

objectively reasonable for the petitioner to be fearful and alarmed based on respondent's conduct. Respondent's conduct as alleged by petitioner went far beyond the leering at an attractive person of the opposite sex, conduct that is typically characterized by our cultural values as permissible although rude social conduct. In contrast to that kind of conduct, respondent, according to petitioner's evidence, repeatedly followed petitioner while she was at her workplace without any apparent reason other than to view her person. Petitioner testified, "[H]e is singling me out and following me around." Another witness testified,

> "I have seen [respondent] come into the store, wonder [sic] through the departments, when he spots her, he follows her to the point that I have gone, Sherry [another store clerk] has done the same thing, we have both gone and stood beside her * * *. The more people around her, the quicker he leaves."

Another witness testified, "I feel that he does look for her when she's not there and when she is there, he will stand at a distance and watch her * * *."

The gravamen of "stalking conduct" under ORS 30.866 is "repeated and unwanted contact" where "[i]t is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact[.]" The evidence offered by petitioner in this case is not dissimilar to the evidence in *Delgado v. Souders*, 334 Or 122, 124, 137-38, 46 P3d 729 (2002), where the Supreme Court upheld a stalking protective order against the respondent's challenge that the evidence was insufficient to show that he had engaged in stalking behavior under ORS 30.866(1). In that case, the petitioner was a college student, and the respondent repeatedly appeared in her presence in unexpected locations while she was walking on campus. *Delgado*, 334 Or at 124-26. Accordingly, I agree that, if the repeated and unwanted following of petitioner throughout her workplace, as testified to by petitioner and her witness, occurred in this case, it is the kind of conduct that falls within the definition of the statute and the case law interpreting the statute. Whatever constitutional freedom exists to be in a public place and observe others who are in that place does not extend, in my view, to following a person in that place to the extent that the person

is objectively and reasonably alarmed about his or her safety, as may have occurred here.

I turn now to why I believe that the stalking protective order in this case must be reversed. "The essence of fundamental fairness is the opportunity to be heard at a meaningful time and in a meaningful manner." *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 189-90, 796 P2d 1193 (1990). As the majority correctly recognizes, we have applied that principle in the context of a stalking protective order hearing under ORS 30.866. *See Miller v. Leighty*, 158 Or App 218, 222, 973 P2d 920 (1999). Here, insofar as the record shows, it is clear that respondent did not have the opportunity to be heard at a meaningful time and in a meaningful manner, much less to confront the witnesses against him.

The hearing in this matter began on April 30, 2002. At that time, the court heard from petitioner and her witnesses. They testified as previously described. During their testimony, respondent did not ask, nor was he offered the opportunity to ask, questions of the witnesses. After petitioner's witnesses had completed their testimony, the court said to respondent, "Okay. All right, it's your turn now Mr. Walker. What do you have to say about the allegations that were made against you here?" Respondent admitted shopping at the store at which petitioner worked. He said that he recognized petitioner as an employee who worked there. He added, "[I]f she has the impression that I am stalking her, I am not. I know nothing about her." The court inquired, "Well, what about the allegations that she made that you are following her around the store and you are looking her over and that sort of stuff?" Respondent denied those allegations, adding "I don't know what else to tell you."

Apparently, the court was not persuaded by petitioner's evidence to the extent that it was willing to issue a permanent order. It ruled,

> "Well what I am going to do is, I am going to set this matter over for 30 days. Mr. Walker, you've heard the allegations here against you. *If I get a report in 30 days or prior to that by Ms. Bryant that any, there has been any further contact with her in the store, I am going to issue the stalking order.* Do you understand that?"

(Emphasis added.) Respondent answered, "Yes, of course; that's totally acceptable, understandable." Petitioner then interjected:

> "What if I can talk security into getting us some tapes to see his abnormal behavior? It is not just him coming in the store. He does single me out. It's more than him just browsing at things, he browsing at me. He treats me like I'm an object."

The court responded:

> "All right, well, what we can do *if it will make you feel any better*, why don't we, we will just set this over for another week rather than 30 days. You bring any additional information that you have, if you have security, you don't have to bring anymore witnesses, if you want to do that.

> *"At this point, you know, it sounds like maybe something is going on, maybe not, I don't know.* Mr. Walker seems to indicate that it's not and if it isn't, than obviously he is going to go out of his way to stay away from you.

> "But I will set the matter over for 30, excuse me, for a week and if you have further evidence to present at that time, we will have another hearing."

(Emphasis added.) Before recessing the hearing, the court again admonished respondent:[1]

> "All right, well, Mr. Walker, be advised that, you know, the Court will issue a stalking order if any conduct remotely resembling what she is talking about occurs here. So my advice to you is to consult an attorney or to stay out of Fred Meyer's, whatever you need to do to stop this. *Because obviously, this woman rightly or wrongly is very concerned*

---

[1] After the court told petitioner that she could present more evidence at the second hearing, petitioner told the court:

> "At first I thought he was just a dirty old man, and I deal with people like this on a regular basis. But he just doesn't give me a compliment; he would stare and look away. He persists to look me up and down. I will turn around to avoid him and a few minutes later, I will turn back around, and there he is down the aisle staring at me."

That statement by petitioner apparently prompted the court to warn respondent that it would issue an order "if any conduct remotely resembling what she is talking about occurs here."

*about her safety. So my advice to you is to stay away from her.*

*"But if you have any further evidence you want to present, we will do it next Thursday at 8:30."*[2]

(Emphasis added.)

The hearing reconvened on May 9, 2002. At the beginning of the hearing, the court asked petitioner whether she had any other testimony or witnesses. Petitioner replied in the negative. She explained that she was unable to procure the videotapes from the store's surveillance cameras. The court inquired whether there had been "any contacts." Petitioner replied, "There has not been contact since then." Petitioner then told the court, in part, "I do not want contact with him in any way, shape or form. I do not want him staring at me. I do not want him leering at me in the store." The court then said, "Okay, what's your response to this, Mr. Walker?"

The following colloquy ensued:

"[RESPONDENT]: Well . . .

"THE COURT: Just basically for the record, you both had a chance if you wanted to get any further evidence or seek legal counsel. I am assuming you did that if you wish to do so. But, uh . . . .

"[RESPONDENT]: Your honor, I do need to bring one thing up. I think was, I don't know how you want to word it, inappropriate or something. Ms. Bryant apparently knows a lady and/or her husband and she obviously has a right to tell her friends about this, but these people, the husband happens to be one of my supervisors at work and he was informed of it and he went and talked to one of my supervisors about it. And uh, I just don't personally feel that that was right so.

"THE COURT: Well, have you been staying out of the store?

---

[2] It appears from the above emphasized comments that the court was not persuaded by the evidence that a permanent stalking protective order should issue based on the evidence that it had heard so far. That inference made it all the more important that respondent have an additional opportunity to be heard if any new evidence was offered at the next hearing.

"[RESPONDENT]: Uh, your honor, no, I have not been on the premises at all. I thought it would be inappropriate for me to even be there until the circumstances were settled; so . . .

"THE COURT: All right."

At that point, petitioner attempted to say something, and the court told her, "Go ahead Ma'am." Petitioner then brought up the matter of the petition for a restraining order that respondent's ex-wife had filed against him in 1992. A colloquy between petitioner and the court ensued regarding the allegations in the petition for the restraining order.[3] It led to petitioner making more statements about respondent's conduct at her workplace. The colloquy begins at page 3 of the transcript of the May 9 hearing. It continues through page 9 of the transcript. At no point between page 3 and page 9 was respondent given an opportunity to respond to petitioner's statements to the court.

Petitioner concluded her statements to the court by saying,

"You know, that's why I feel threatened by him. When is it going to escalate to the next level? You know, if I do not get this put into effect, I would like a restraining order put against him. I know I can go down to the police station and do that. I don't know whether they can court[-]issue restraining orders, if I can do so, I would like that, because I do feel threatened by him. I feel threatened by his presence."

The court then inquired, "Anything further?" and petitioner answered, "No."[4] The court then said,

---

[3] The trial court's statements indicate that a restraining order was issued pursuant to the petition. Whether the order is an *ex parte* order is not apparent from the court's characterization of it.

[4] The majority concedes that one interpretation of the above colloquy is that the court's question "Anything further" was directed solely at petitioner. Nonetheless, it holds, "we are unwilling to conclude on the record before us that the court's question was not directed also at respondent. If that was the case, then [respondent] was not deprived of his opportunity to present his case and cross-examine petitioner." 190 Or App at 259. With all due respect to the majority, there is nothing in the record that supports its interpretation that the court's question was also directed at respondent. Before the court's question, only petitioner had been speaking. She told the court that she felt threatened by respondent's presence. The court had no occasion at that point to direct a question to respondent until it was assured

"Okay, all right, well *I think I have essentially heard enough*. I am going to find that Mr. Walker has either intentionally, knowingly, or recklessly made repeated unwanted contact with *you* and an objectively reasonable person in your position would be alarmed by that contact and the contact has caused *you* reasonable apprehension regarding your personal safety. Therefore I am going to enter a court protective order."

(Emphasis added.)

The above record is subject to no other interpretation than that respondent did not receive a meaningful opportunity at the May 9 hearing to respond to the additional evidence about the restraining order and to the testimony about his conduct in respondent's workplace before the court ruled. Although the court initially offered respondent the opportunity to make a response, it interrupted his explanation before he could give it. When he subsequently brought up another matter regarding statements made to his work supervisor, the court reiterated its inquiry regarding his conduct since the last hearing. It then appeared to accept his assertion that he had stayed away from the store during that time period. In light of the court's statements about the weight of the evidence after the first hearing, it appears that the court was not inclined to grant a permanent stalking protective order. However, petitioner interjected at the last moment, telling the court, "I do have some further evidence." She proceeded to offer the additional statements referred to above. After hearing that evidence, the trial court ruled summarily without giving respondent an opportunity to respond to petitioner's additional evidence. In my view, the failure to

that petitioner had finished speaking. Only petitioner responded to the court's question. Further, the context of the court's ruling that followed the court's question and petitioner's answer and its use of pronouns "you" in that ruling confirms that it had been addressing only petitioner. In the abstract, it is always possible that the record does not reflect what actually occurred. However, in this case, respondent would have had no opportunity to make a record that could indicate that the court's question was addressed to him. *See also* note 5 below. Ultimately, we can consider the record only as it is prepared and presented to us after the parties have had an opportunity to correct any errors in it. Here, petitioner did not file a brief. Thus, we do not even know whether petitioner agrees with the majority's interpretation of the record. Under all the above circumstances, the majority's refusal to review respondent's assignment of error is puzzling, and it promotes, in my view, an ill-conceived policy about when we should review an issue concerning the fundamental right of a party to have his or her day in court.

give respondent the opportunity to respond to the evidence about the allegations in the petition for a restraining order involving his ex-wife and petitioner's additional evidence about what occurred in the store operated to deny him a meaningful opportunity to present his evidence on the issues prosecuted by petitioner.

The remaining issue is whether the majority is correct in refusing to review the above issue on the ground of lack of preservation or as error apparent on the face of the record. The governing legal authority regarding appellate review is ORAP 5.45 and the case law developed under it. The rule itself mandates no specific requirements for preservation, and we are left to apply it in a manner that accomplishes its policy objectives. Its objectives, according to the Oregon Supreme Court, are to provide an opportunity for the opposing party to present its position and to permit the trial court to understand the issue and correct any error before an appeal occurs. *State v. Brown*, 310 Or 347, 356, 800 P2d 259 (1990). Obviously, any consideration of those policy objectives in a particular case is affected by the nature of the underlying proceeding itself and the opportunities that the proceeding inherently offers to fulfill the objectives of the rule's requirement of preserving error for appellate review.

The proceeding in this case was informal, in accordance with the procedure mandated by statute, and unlike the typical trial of a civil case. Under ORS 163.744, any person may initiate an action seeking a stalking protective order by presenting a complaint to a law enforcement officer or to any law enforcement agency. The complaint must set forth a statement alleging with particularity the conduct that forms the basis for the request. At the hearing on the request, "the petitioner may appear in person or by telephonic appearance. The respondent shall be given the opportunity to show cause why a court's stalking protective order should not be entered." ORS 163.738(2)(a). The court is authorized by statute to enter a stalking protective order only if finds that the requirements for issuance are satisfied by a preponderance of the evidence. Those procedures were followed in this case. Significantly, no provisions in the statute exist for filing other pleadings or for making procedural motions or other legal niceties commonly associated with civil trial practice.

Based on the provisions of ORS 163.730 to 163.755, it is unlikely that the legislature intended that a particular procedure be followed before a claim of error affecting the merits of the trial court order on appeal could be raised, and it follows that we should be circumspect about applying an appellate rule to deny review in a manner that would frustrate the legislature's objective of affording an expedited and simplified proceeding for the issuance of a stalking protection order.

It is with that background that I turn to the specific facts of this case. It cannot be reasonably contended that the first objective of ORAP 5.45 regarding preservation was not met. Petitioner was given the opportunity to say everything she wanted to say to the trial court. In fact, it appears that the court would not have issued the order but for her belated presentation of the petition filed against respondent by his ex-wife more than ten years previously. In effect, she was given the opportunity to have the "last word." As to the second objective, that of giving the trial court the opportunity to rule, it was the trial court itself that cut off respondent's opportunity to respond to petitioner's new evidence. It said that it "had heard enough" and ruled on the merits without giving respondent the opportunity to be heard further.[5] "Fundamental fairness" required that respondent be given the opportunity to respond to petitioner's evidence. That understanding is so basic that I would not hesitate to hold that no preservation was required under the circumstance or, alternatively, that this case should be reviewed as error apparent on the record. *See Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382 n 6, 823 P2d 956 (1991).

For the above reasons, I dissent.

---

[5] In my experience as a trial lawyer and trial judge, it never behooved a litigant to interrupt a trial court in the midst of its making findings and issuing a ruling. When the court said that "it had heard enough," respondent, in my view, was entitled to take the court at its word. When the court ruled, respondent could reasonably have believed that the hearing was over and his only recourse was with another court. Under the circumstances, he was not required under ORAP 5.45 to object further.